**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. __________** |
| | : | |
| **v.** | : | **Violation:** |
| | : | |
| | : | **18 U.S.C. § 371 (Conspiracy)** |
| **MICHELLE CHO,** | : | |
| | : | **Forfeiture:** |
| | : | **18 U.S.C. § 981(a); 28 U.S.C. § 2461(c)** |
| **Defendant.** | : | **21 U.S.C. § 853(p)** |

**INFORMATION**

The United States charges that:

COUNT ONE-CONSPIRACY

At various times relevant to this Information:

Introduction

1. Michelle Cho ("Defendant") resides in Illinois. At various times throughout the relevant period, Defendant held officer positions with Far East Construction Corporation ("Far East") and Company 2.

2. Far East purported to specialize in, among other things, design build services of energy and renewable programs; general contracting and construction staffing services; and mechanical, electrical, plumbing, renovation, and carpentry. Far East was headquartered in Illinois, and was certified to participate in the "8(a) program." The 8(a) program is administered by the Small Business Administration ("SBA"), a department and agency of the United States, and is a development program that was created to help small, disadvantaged businesses. For portions of the relevant period, Far East was also certified to participate in the Historically

Underutilized Business Zone ("HUBZone") program. Far East's primary business address was the home address of relatives of Defendant.

3. Company 2 purported to specialize in, among other things, design build services of energy and renewable programs; general contracting and construction staffing services; and mechanical, electrical, plumbing, renovation, and carpentry. At all relevant times, Company 2 was certified to participate in the 8(a) program.

4. MCC Construction Corporation ("MCC") was a construction management company and a general contractor that provided design/build, renovation/restoration, and new construction services. It was founded in 1986, and its home office was located in Greenwood Village, Colorado, with regional offices in different parts of the country. MCC was actively managed by Thomas Harper ("Harper"), Walter Crummy ("Crummy"), Person D, and Person F, who were all owners of MCC.

5. At all relevant times, Harper was an officer of MCC and one of the owners of the company. He was the Vice President of the Northeast Region.

6. At all relevant times, Crummy was an officer of MCC—holding, at various times, the titles of Controller and CFO—and one of the owners of the company.

7. At all relevant times, Person D was an officer of MCC and one of the owners of the company.

8. For portions of the relevant period, Person F was an officer of MCC and one of the owners of the company.

9. At all relevant times, the email and telephonic communications in furtherance of this scheme were transmitted in interstate commerce.

The Conspiracy and Its Objects

10. From at least in or around January 2008 through in or around August 2013, in the District of Columbia and elsewhere, Defendant,

**MICHELLE CHO**

and others unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed with one another and with others to commit offenses against the United States, that is, to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing they were false and fraudulent when made, and for the purpose of executing such scheme and artifice and attempting so to do, did cause to be sent and delivered interstate wire communications, in violation of Title 18, United States Code, Section 1343.

Goal of the Conspiracy

11. The goal of the conspiracy was for Defendant, MCC, Far East, and others to enrich themselves by engaging in a conspiracy and a scheme to defraud in which they obtained funds from the United States, and an agency thereof, by means of false and fraudulent pretenses, representations, and promises.

Manner and Means of the Conspiracy

12. Defendant, MCC, Far East, and others used the following manner and means, among others, to accomplish the objects and goal of the conspiracy:

a. Far East, at Defendant's direction, partnered with MCC so that MCC could gain access to contracts that were awarded through the 8(a) program. To qualify for the 8(a) program, a business must be at least 51% owned and controlled by a U.S. citizen (or

citizens) of good character who meet the SBA definition of socially and economically disadvantaged. For construction contracts, at least 15 percent of the cost of contract performance to be incurred for personnel must be spent on the HUBZone prime contractor's employees.

b. Far East, at Defendant's direction, partnered with MCC so that MCC could gain access to contracts that were awarded through the HUBZone program. To qualify for the HUBZone program, a company must establish that: i) it is a small business; ii) it maintains a principal office located within an area that has been designated as a HUBZone; and iii) at least 35% of its employees reside within designated HUBZone areas. For construction contracts, the HUBZone business must perform, at least, 15% of the cost of contract performance incurred for personnel on the HUBZone company's employees.

c. Defendant, Far East, MCC, and others concealed the fact that MCC, which was not eligible for the aforementioned SBA contracting preferences, exercised impermissible control over Far East's bidding for and performance of Far East's contracts.

d. Defendant, Far East, MCC, and others agreed that MCC would furnish all labor, equipment, material, safety, and supervision for contracts that Far East subcontracted to MCC.

e. Defendant, Far East, MCC, and others agreed that for each government contract that Far East subcontracted to MCC, Far East would award MCC 97% of the value of the contract.

f. Defendant, Far East, MCC, and others concealed the fact that, at all relevant times, Far East was not performing, at least, 15% of the cost of the contract with its own employees.

g. Defendant, Far East, MCC, and others misrepresented that Far East was in compliance with SBA regulations pertaining to Far East's contracts obtained through this scheme, including that Company employees had performed the required percentage of work on those contracts.

## OVERT ACTS

13. Within the District of Columbia and elsewhere, in furtherance of the above-described conspiracy and in order to carry out the objects thereof, Defendant, MCC, Far East, and others committed the following overt acts, among others:

a. In and around 2008, Far East, at Defendant's direction, and MCC agreed that MCC would be responsible for managing more of the labor required to complete a contract than would be allowed under the SBA's 8(a) and HUBZone regulations, and for paying these labor costs.

b. On or about January 22, 2009, the SBA determined that, given Far East's improper affiliation with MCC as it related to a specific project in Boston, Far East was not a qualified small business under the 8(a) program. Rather than ceasing the Far East/MCC relationship in response to that determination, Far East and MCC sought to further conceal the nature of their arrangement. On or about February 5, 2009, a Far East employee, after reviewing a bid that MCC prepared on behalf of Far East, and with approval of Defendant, sent an email stating "shouldn't we show the [Project Manager], [Quality Control Manager], and Safety Manager as [Far East] employees?" Harper responded, "I agree, we should take MCC out of their resumes." With Defendant's approval, the resumes for key employees were ultimately amended to remove any reference to the MCC employees' current place of employment. Also

with Defendant's approval, the proposal was drafted in such a way to suggest that these individuals were Far East, not MCC employees.

c. On or about July 2, 2009, Far East, at Defendant's direction, and MCC negotiated, drafted, and adopted addendums to their existing profit and cost reimbursement agreement, including the following provisions:

> 3. Upon award of each and every task order under the Contract by the Government to Far East, Far East will award a subcontract for that task order in the amount of 97% of the amount of that task order to MCC.
>
> 4. MCC will furnish all labor, equipment, material safety and supervision to perform the respective scope of work of the task order.
>
> 5. Far East will provide two employees, currently [Nominal Employee 1] and [Nominal Employee 2], and MCC will reimburse Far East for the payroll cost of those two employees upon receipt of an invoice from Allstates Technical Services, LLC. Those reimbursed amounts will be charged to the task orders as noted on the employees' time sheets.
>
> 6. Upon agreement with MCC, if Far East executes a subcontract directly with a subcontractor for a portion of the scope of work of a specific task order, then Far East will deduct that amount from its subcontract agreement with MCC however MCC will continue to be responsible for the supervision of that subcontractor unless another written agreement is executed.
>
> 7. MCC will pay all site overhead costs . . . .

Defendant was aware that these principles—that MCC would provide all labor, equipment, material safety and supervision and receive 97% of the task order amount—would and did become the operating principles for contracts that Far East and Company 2 subsequently

obtained and subcontracted to MCC. Under this arrangement, Defendant knew that Far East and Company 2 lent their names and small-business status to MCC, and that MCC bore nearly all of the expenses of actually fulfilling these contracts. The agreement, by its terms, meant that Far East and Company 2 would be violating the requirement that they perform at least 15% of the cost of the contract, not including the cost of materials, with their own employees. In addition, under the terms of this arrangement, Defendant knew that Far East and MCC agreed to make it appear that Far East paid for and controlled employees who worked on Far East project sites, when in actuality, MCC paid for these employees and managed them.

d. On or about December 23, 2009, Defendant called Crummy and discussed a number of issues, including Defendant's concern about meeting Far East's requirement that it perform at least 15% of the cost of the contract, not including the cost of materials, with its own employees.

e. On or about December 24, 2009, Crummy sent an email summarizing the conversation, explaining, "[Defendant] then expressed concern that if MCC was paying for [Nominal Employee 1, Nominal Employee 2, and Nominal Employee 3] that would be a problem. [Defendant] indicated that Far East could pay for some of these people and then be reimbursed when the owner billings are received." Accordingly, even though Defendant acknowledged that MCC reimbursing Far East for these nominal employees would be a problem under the self-performance requirement, the solution was not that Far East would start paying the expenses of these nominal employees and managing them. Instead, the proposed solution by Defendant was that MCC would reimburse Far East for the expenses of these nominal employees in a way that made the reimbursement less transparent. Crummy sent the email summarizing this concern and the proposed solution to Harper and Person D.

f. On or about January 19, 2010, Crummy prepared, as instructed by Harper following Harper's negotiations with Defendant, and circulated, via email, to Harper, Person D, and Person F contract addendums substantially identical to those quoted above in paragraph 13(c). In and around February 2010, these addendums were executed.

g. In and around April 2010, Crummy exchanged emails with a contracting agency about the status of payments to Far East. Crummy's email address had a domain name that included Far East's name, and the signature block of his email address identified his organization as Far East. Defendant, Crummy, and others intended that such email domains would falsely suggest that MCC employees were Far East employees.

h. MCC obtained the following contracts through Far East and Company 2:

| Award Recipient | Contract Name | Contract Number | Award Date | Date Complete | MCC Revenue |
|---|---|---|---|---|---|
| Far East | Fort Jackson | W911SE-08-D-0008 | 6/30/08 | 6/3/13 | $30,728,812 |
| Far East | Fresno NG-Solar | W912LA-08-C-6001 | 7/31/08 | 1/12/09 | $1,803,102 |
| Far East | Pennsylvania | N40085-08-C-2871 | 9/12/08 | 6/18/10 | $4,393,386 |
| Far East | Willow Grove | N40085-08-C-2813 | 9/29/08 | 3/13/09 | $321,161 |
| Far East | Mississippi | W912C6-08-P-0168 | 9/30/08 | 12/1/08 | $48,744 |
| Far East | Main Gate | N40085-09-C-0111 | 4/17/09 | 9/30/09 | $180,405 |
| Far East | GSA – SC | GS-04P-09-EXD-0047 | 6/29/09 | 4/22/13 | $558,099 |
| Far East | Arnold AFB | FA9101-09-D-0030 | 7/9/09 | 5/15/12 | $3,272,081 |
| Far East | Fort Collins | SB1341-09-CN-0093 | 7/29/09 | 11/5/09 | $399,300 |
| Far East | New York/Buffalo | W912P4-09-D-0009 | 8/13/09 | 12/7/09 | $240,731 |
| Far East | Mechanicsburg | N40085-09-C-0088 | 9/29/09 | 11/8/10 | $1,239,947 |

| | | | | | |
|---|---|---|---|---|---|
| Company 2 | Fort Polk – IED Repair | W9127S-09-C-6013 | 9/29/09 | 6/25/10 | $91,254 |
| Company 2 | Fort Polk – Bldg. 7840 Exp. | W9127S-09-C-6015 | 9/29/09 | 9/12/10 | $346,533 |
| Company 2 | Fort Polk – Secure Storage | W9127S-09-C-6017 | 9/29/09 | 9/15/10 | $268,139 |
| Company 2 | Fort Polk – Eastern Area Res. Office | W9127S-09-C-6018 | 9/30/09 | 3/31/11 | $689,131 |
| Company 2 | Fort Polk – Replace Main Dist. Panels | W9127S-09-C-6016 | 10/26/09 | 9/25/10 | $912,186 |
| Far East | Whitman AFB | W912DQ-09-D-4015 | 12/23/09 | 2/26/13 | $10,421,780 |
| Company 2 | Fort Polk – FOB Barracks | W9127S-09-C-6019 | 12/30/09 | 11/30/11 | $1,303,948 |
| Company 2 | Pennsylvania | N40085-10-C-5862 | 3/16/10 | 10/31/11 | $1,366,711 |
| Company 2 | Substation | N40085-10-C-5863 | 3/25/10 | 12/31/11 | $1,368,296 |
| Far East | Coast Guard – North | HSCGG-110-D-PRV057 | 8/6/10 | 9/30/11 | $842,482 |
| Far East | Fish & Wildlife | 401817D026 | 9/4/10 | 3/31/12 | $561,432 |
| Company 2 | Fort Polk – Ren. Bldg. 4740 | W9127S-09-C-0292 | 9/16/10 | 3/15/11 | $90,768 |
| Company 2 | Fort Polk – Design & Constr. | W9127S-09-C-6032 | 9/30/10 | 11/30/11 | $1,287,878 |
| Far East | Coast Guard – South | HSCG-821-D-PMVA39 | 2/9/11 | 1/31/13 | $788,895 |
| Company 2 | RI Navy/ D-F JV | N40085-10-D-9430 | 4/27/11 | 8/7/13 | $6,749,693 |
| | | | | **Total:** | **$70,274,894** |

i. Between in or around January 2008 and in or around August 2013, Far East provided no substantive services in connection with these contracts. Instead, Far East subcontracted these contracts in their entirety to MCC, played no substantive role in project delivery, and collected an approximately three percent fee for allowing its small business status to be used.

14. Throughout the relevant period, Defendant received at least $169,166.52 as a result of her participation in this scheme.

**(Conspiracy to Commit Wire Fraud, in Violation of Title 18, United States Code, Sections 371 and 1343.)**

## FORFEITURE ALLEGATION

15. Upon conviction of the offense alleged in Count One, Defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to this offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The United States will also seek a forfeiture money judgment against Defendant in the amount of $169,166.52.

16. If any of the property described above as being subject to forfeiture, as a result of any act or omission of Defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be divided without difficulty;

Defendant shall forfeit to the United States any other property of Defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))**

CHANNING D. PHILLIPS
United States Attorney
Bar No. 415793

By: ______________________________
JOHN MARSTON
Bar No. DC - 493012
Assistant United States Attorney
Fraud & Public Corruption Section
555 4th Street, N.W., Room 5227
Washington, DC 20530
202-252-6886

LISA M. PHELAN
Chief
Washington Criminal I
Antitrust Division:

______________________________
KEVIN HART
JUSTIN MURPHY
Trial Attorneys
Washington Criminal I
Antitrust Division
United States Department of Justice
450 Fifth Street, N.W., Suite 11300
Washington, D.C. 20530